# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No.  25-CR-4068-LTS-KEM |
| vs. | **REPORT AND RECOMMENDATION** |
| ROCKY HERNANDEZ, | |
| Defendant. | |

_____

Defendant Rocky Hernandez moves to suppress evidence obtained as the result of a warrant search, arguing lack of nexus and staleness.  Doc. 24.  He also moves to suppress evidence obtained as the result of a stop-and-frisk, arguing the officer lacked reasonable suspicion he was armed.  The Government filed a resistance (Doc. 30), and Hernandez filed a reply (Doc. 33).  I held an evidentiary hearing on the motion on May 27, 2026.  Doc. 38.  At the hearing, the following witnesses testified:

- Lieutenant Daniel Plueger;
- Sheriff Jeff TeBrink; and
- Officer Brianna Malone.

I also admitted the following exhibits into evidence:

- Ex. A (Doc. 25-1) – Search warrant materials (filed under seal);
- Ex. B (Doc. 25-2) – Search warrant inventory list (filed under seal);
- Ex. C (Doc. 25-3) – Lieutenant Plueger's report (filed under seal);
- Ex. D (Doc. 25-4) – Officer Malone's report (filed under seal);
- Ex. E (Doc. 24-2) – Streetview image from Google Maps;
- Ex. 1 (Doc. 30-1) and Ex. 2 (Doc. 30-2) – Officer Malone's body camera video clips;
- Ex. 3 (Doc. 37-1) – Lieutenant Plueger's body camera video clip; and
- Ex. 4 (Doc. 37-2) – Eviction order.

I recommend **granting in part and denying in part** the motion to suppress.

## I. BACKGROUND[1]

On November 7, 2024, LeMars Police Lieutenant (then Sergeant) Dan Plueger obtained a state search warrant to search Hernandez's trailer home and two registered vehicles for firearms and ammunition (Ex. A). The narrative to support probable cause indicated that Hernandez's landlord was working with the Plymouth County Sheriff's Office to evict Hernandez. As part of that process, the landlord told Sheriff TeBrink that "Hernandez had given him an AR-15 rifle in the past and that he also has seen [Hernandez] with a handgun." Ex. A at 12. At that time, Hernandez had at least two felony convictions and was prohibited from possessing firearms.

The narrative goes on to note that Sheriff TeBrink relayed his conversation with the landlord to Lieutenant Plueger on November 6, and Lieutenant Plueger met with the landlord to obtain additional information on November 7. The landlord explained that Hernandez had needed money, so on April 27, 2024, Hernandez sold the landlord an AR-15 rifle for $300 cash, with the understanding that Hernandez could pay back the money for the rifle's return. The landlord stated he took a picture of Hernandez's driver's license and Social Security card and made a writing to memorialize the transaction, which he provided to Lieutenant Plueger for inclusion in the search warrant application (Ex. A at 8-10). The writing states the landlord "got this AR Riffle [sic] from Rocky Hernandez for 300.00 cash now 4-27-24 . . . Monday at the gun store." Ex. A at 9. Hernandez never asked for the rifle's return, and the landlord ultimately traded it to another individual for a car trailer (Lieutenant Plueger confirmed with this individual that he had received an AR-15 from the landlord in exchange for a car trailer). The narrative further states that the landlord "had seen . . . Hernandez in possession of a handgun that was either silver or aluminum in color" and either "a 9 mm or 45 mm gun." *Id.* at 12. It

---

[1] The facts in this section come from the exhibits admitted into evidence and testimony at the suppression hearing.

does not provide any additional details, such as where or when the landlord saw Hernandez with a handgun, and Lieutenant Plueger did not obtain this information from the landlord. Hernandez told the landlord that he had a handgun if anyone broke into his residence, but this fact is not included in the warrant application.

Lieutenant Plueger's police report (Ex. C) indicates that he consulted with the Plymouth County Attorney's Office to confirm Hernandez's status as a felon. It further notes that "[i]n speaking with the County Attorney's Office, it was their opinion that we should conduct a search on both Rocky Hernandez'[s] residence and his vehicles" and that if the search revealed a handgun, they would bring charges; but if it did not, they would revisit charges related to the AR-15 at that time. Ex. C. At the hearing, defense counsel asked whether Lieutenant Plueger only included the vehicles in the search warrant at the County Attorney's Office direction, and Lieutenant Plueger testified that he did not recall. He also admitted that he had received no information about Hernandez possessing firearms in his vehicles, but he requested a search warrant for both the residence and vehicles operating under the assumption there would be something in the vehicles.

A state judge issued the warrant on November 7. Law enforcement searched Hernandez's house and vehicles on November 8, seizing firearms, ammunition, and drugs from both his residence and one of the vehicles. Hernandez was charged under state law with unlawfully possessing a firearm as a felon.

While on pretrial release on the state charges, Hernandez was charged with drug and firearm offenses in Texas state court. The Texas charges stem from an incident in the early morning hours on October 15, 2025, in Pearsall, Texas. Pearsall Police Department Officer Brianna Malone observed Hernandez "walking westbound on the wrong side of the street" (in an area with no sidewalks) and initiated a stop in her patrol vehicle. Ex. 1.

Officer Malone's body camera footage shows that Hernandez continued walking past her as she tried to talk to him. Officer Malone told Hernandez that he needed to

walk facing toward oncoming vehicles.  Hernandez said that a dog had tried to bite him and that he crossed the street to get away from the dog.  Officer Malone acknowledged seeing the dog and said she thought it belonged to Hernandez.  Officer Malone testified that when she made clear she was stopping Hernandez by asking for his identification, Hernandez stopped and complied with her request.

Another officer quickly arrived as backup.  Officer Malone testified that in her police department, she worked separately from her partner, but when she stopped someone late at night, her partner would drive by and provide backup if necessary.  She testified that backup might also be provided based on the identity of the person stopped or the reason for the stop.  That night, her partner acted as backup because he recognized Hernandez, having arrested him about a week prior for methamphetamine possession.  Officer Malone testified that when she ran Hernandez's driver's license, she recognized his name and remembered her partner telling her about this arrest .

As Officer Malone ran Hernandez's information, Hernandez twice said that he crossed the street to move away from a dog that was trying to bite him.  Officer Malone asked where he was going.  Hernandez said, "home," pointing in the direction he had just come from.  Officer Malone asked whether his address on his identification was correct, and he said it was an old address.  Officer Malone testified that a person had some time under Texas law to update the address on their driver's license[2] and that it was not uncommon for people to have the wrong address listed.

Officer Malone then asked if Hernandez had anything on his person she should be worried about, like a pocketknife.  Hernandez said he did not.  Officer Malone asked, "Are you okay if I search you real quick?"  Hernandez declined, saying he was not doing anything wrong.  Officer Malone said that if he did not have anything on him, he did not

---

[2] *See* **Tex. Transp. Code Ann. § 521.054** (thirty days to notify transportation department of new address).

have anything to worry about. Hernandez responded he did not have anything on him. Officer Malone said he should allow the search, and then she would end the encounter without issuing a citation. Hernandez said "they" did this last time and found nothing. Officer Malone said she had never encountered Hernandez before and did not know him. She offered that if she did not have anything on her person, and someone asked to search her, she would say, "yeah, go for it." Hernandez again said he was not doing anything wrong. Officer Malone responded that Hernandez was walking on the wrong side of the street. Hernandez said he did not have anything on his person and would not consent to a search. Officer Malone said that she was going to pat him down anyway.

Hernandez asked whether Officer Malone had probable cause to search. Officer Malone explained that she was not going to search his pockets and that she only needed reasonable suspicion to conduct a pat-down search. Hernandez asked what law he was breaking, and Officer Malone said he was walking on the wrong side of the street. Hernandez said he had just turned the corner. Officer Malone went to her patrol vehicle to retrieve something and put gloves on. Hernandez reiterated that he did not consent to being searched. Officer Malone said she could pat him down without going through his pockets. She said if she found nothing, he would be allowed to go without even a citation. She volunteered that she had seen the dog behind him—and Hernandez jumped in, saying it tried to bite his leg. Officer Malone said, "if that's what you're telling me, I'm going to believe you." Hernandez said that he did not consent to a search and that he wanted to call his sister, who was a police sergeant (not with the Pearsall Police Department). Officer Malone suggested she would let him call his sister on speaker phone and asked where his cell phone was located. When Hernandez said it was in his pockets, Officer Malone said she did not want him to go through his pockets when he was resisting a pat-down search. Hernandez said he did not want to be searched because he was not doing anything wrong and he knew the law. Officer Malone told Hernandez to place his hands on the patrol vehicle, and he said he wanted to exercise his rights. Officer Malone said

it was not part of his rights to decline and again tried to explain the difference between a search and a pat-down. They went back-and-forth a few more times, and then the backup officer authoritatively instructed Hernandez to put his hands on the car, Officer Malone grabbed his arm to force him to face the car, and Hernandez complied. Officer Malone conducted the pat-down search.

As a result of the pat down, Officer Malone found a handgun in Hernandez's waist band and methamphetamine in his pocket. He was arrested and jailed in Texas, therefore missing his court date for the pending charges in Iowa. After missing his court date, he was charged in this court in December 2025 with unlawful possession of a firearm as a felon (based on evidence seized during the execution of the search warrant in November 2024). Docs. 2, 6. He filed the pending motion to suppress the evidence seized pursuant to the warrant in November 2024, as well as the evidence seized from his person after the *Terry*[3] pat down in October 2025.

### II.     *NOVEMBER 2024 WARRANT SEARCH*

Hernandez challenges the warrant's probable cause finding. In particular, he challenges the nexus between the facts in the affidavit and the places to be searched (his residence and vehicles). He also argues firearm possession from seven months prior is too stale to support probable cause to believe he currently possessed firearms.

In accordance with "[t]he Fourth Amendment's strong preference for searches conducted pursuant to a warrant," "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review"; "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for concluding' that

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

probable cause existed."[4]  Probable cause exists when, "under the totality of circumstances, there is a fair probability [that] evidence of a crime will be found in a particular place" or that the requested search will "lead to the discovery of evidence."[5] "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, [the Eighth Circuit] has also recognized that law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'"[6]

"[T]o support an application for a search warrant, '[t]here must be evidence of a nexus between the contraband and the place to be searched.'"[7]  "Factors to consider in determining if a nexus exists include 'the nature of the crime and the reasonable, logical likelihood of finding useful evidence.'"[8]

In addition, probable cause to search must "exist at the time at which the warrant is issued, not at some earlier time."[9]  "[D]elay in seeking and obtaining a search warrant may invalidate it" under the staleness doctrine, but "[t]here are other factors to be considered, including the nature of the criminal activity involved, and the kind of property for which authority to search is sought."[10]  "Obviously, a highly incriminating or

---

[4] *Illinois v. Gates*, 462 U.S. 213, 236, 238-39 (1983) (cleaned up) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)); *accord United States v. Buchanan*, 574 F.3d 554, 561 (8th Cir. 2009).

[5] *United States v. Faulkner*, 826 F.3d 1139, 1144, 1146 (8th Cir. 2016).

[6] *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)).

[7] *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017) (quoting *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016)).

[8] *Id.* (quoting *Colbert*, 828 F.3d at 726).

[9] *United States v. Steeves*, 525 F.2d 33, 37 (8th Cir. 1975).

[10] *Id.* at 38.

7

consumable item of personal property is less likely to remain in one place" for a long period of time.[11]   On the other hand, "[i]nformation that someone is suspected of possessing firearms illegally is not stale, even several months later, because individuals who possess firearms tend to keep them for long periods of time."[12]

Even when a warrant is not based on probable cause, the *Leon*[13] good-faith exception may save the evidence from suppression.

> While the "ordinary sanction for police violation of Fourth Amendment limitations has long been suppression of the evidentiary fruits of the transgression, the exclusionary rule does not apply when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope."  This good faith exception does not apply when an officer executes "a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*."   This is an objective inquiry—whether "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  "'Entirely unreasonable' is not a phrase often used by the Supreme Court and is a particularly strong choice of words."  "The exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates."[14]

---

[11] *Id.*

[12] *United States v. Neal*, 528 F.3d 1069, 1074 (8th Cir. 2008).

[13] *United States v. Leon*, 468 U.S. 897 (1984).

[14] *United States v. Diaz*, 154 F.4th 621, 628-29 (8th Cir. 2025) (cleaned up) (first quoting *United States v. Saddler*, 19 F.4th 1035, 1040 (8th Cir. 2021); then quoting *Leon*, 468 U.S. at 923; then quoting *id.* at 922 n.23; then quoting *United States v. Carpenter*, 341 F.3d 666, 670 (8th Cir. 2003); and then quoting *Leon*, 468 U.S. at 916).  In addition to an affidavit so bare bones that it is unreasonable to believe it sets forth probable cause, the good-faith exception does not apply in three other circumstances that are not applicable here.  *See Saddler*, 19 F.4th at 1040 (good-faith exception does not apply to *Franks* violations, to facially deficient warrants unreasonably lacking particularity, and "when the issuing magistrate 'wholly abandoned his judicial role'" (quoting *Leon*, 468 U.S. at 923)).

A court may uphold a warrant under good faith without first determining the existence of probable cause.[15]

Like the affidavit, the briefing for both parties discusses the existence of probable cause to search Hernandez's residence and vehicles as a unit. For both legal and practical reasons, I analyze them separately.

### A. Residence Search

I find that the good-faith exception applies to the search of the residence. Unlike drugs, firearms are not particularly incriminating and have permanence (as the testimony elicited by the Government illustrates).[16] It is reasonable to assume that someone might maintain possession of a firearm for a significant period of time.[17] Thus, the Eighth Circuit has "held that information four months old, or even three years old, may supply probable cause for a warrant to search the home of a person suspected of illegal possession of a firearm, due to the continuing nature of the possession offense and the tendency for firearms enthusiasts to keep their weapons for long periods of time."[18] In

---

[15] *See Diaz*, 154 F.4th at 628.

[16] This distinguishes the staleness cases relied on by Defendant. *See United States v. Kennedy*, 427 F.3d 1136, 1139, 1141-42 & n.5 (8th Cir. 2005) (distinguishing drug possession from firearm possession, specifically relying on the fact that drugs are "mobile, easily concealed, readily consumable, and highly incriminating," to find probable cause did not exist to search a car under the automobile exception based on ex-girlfriend's "undated information" that she had seen defendant with methamphetamine on more than one occasion and that he "keeps" it in the trunk of his car); *United States v. Button*, 653 F.2d 319, 324-25 (8th Cir. 1981) (pre-*Leon*) (holding that conclusory, uncorroborated statements from confidential informant (CI) that defendant is supplying PCP to two individuals, along with undated statement CI saw a large quantity of PCP at defendant's residence, failed to establish probable cause to search defendant's residence in part due to drugs' nature as "easily concealed and moved about" (quoting *Ashley v. State*, 241 N.E.2d 264, 269 (Ind. 1968))).

[17] *See Neal*, 528 F.3d at 1074.

[18] *Kennedy*, 427 F.3d at 1142 n.5 (describing *United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995), in which defendant was a "survivalist" who reportedly possessed numerous firearms

addition, the Eighth Circuit has held when "the warrant affidavit establish[es] probable cause that [defendant] possessed . . . firearms, it follows that probable cause exist[s] to search [defendant's] residence, because people 'generally keep firearms at home or on their persons.'"[19]

Here, the warrant affidavit states that Hernandez sold an AR-15 rifle to his landlord seven months prior. Although Hernandez was no longer in possession of the AR-15 rifle—and in fact, the landlord had sold it to a third party—the sales agreement between Hernandez and the landlord recognized a right for Hernandez to "repurchase" the firearm, increasing the likelihood that he retained ammunition for it. The affidavit also stated the landlord had seen Hernandez with a handgun at some unspecified point in time. Not included in the affidavit but known to Lieutenant Plueger is the additional fact that the landlord indicated Hernandez had the handgun for protection at his residence. "[W]hen assessing the officer's good faith reliance on a search warrant under the *Leon* good faith exception, [the court] can look outside of the four corners of the affidavit and consider the totality of the circumstances, including what the officer knew but did not include in the affidavit."[20] That officers knew Hernandez kept a firearm for home defense supports their belief that a nexus existed to search his residence, even if this information was not made available to the issuing judge. Overall, given the continuous nature of firearms possession and the additional information known by Lieutenant Plueger

---

and grenades); *see also Steeves*, 525 F.2d at 38 (upholding nearly three-month delay in searching residence for firearm used in a bank robbery against staleness challenge, noting that "apart from [defendant's] prior felony record[,] possession of the pistol was not unlawful in itself or particularly incriminating," so that defendant would not be motivated to get rid of it as soon as possible).

[19] *United States v. Cowling*, 648 F.3d 690, 696 (8th Cir. 2011) (cleaned up) (quoting *Steeves,* 525 F.2d at 38 (addressing staleness)).

[20] *United States v. Farlee*, 757 F. 3d 810, 819 (8th Cir. 2014).

connecting Hernandez's firearm possession to his residence, the warrant affidavit was not so lacking in probable cause that it was unreasonable for officers to rely on it to search Hernandez's residence. I recommend upholding the search of Hernandez's residence under the *Leon* good-faith exception.[21]

### B. Vehicles Search

I find the vehicle searches present a much closer issue. If the officers had conducted a traffic stop of Hernandez, I would not have found probable cause to search his vehicle for firearms based on his selling a firearm six months prior and being seen with a different firearm at some unknown date in the past (for protection of his residence). But because officers obtained a warrant, the question is whether probable cause was so lacking as to render reliance on the warrant entirely unreasonable.

For the reasons discussed in the preceding section, officers could reasonably believe that the warrant set forth probable cause that Hernandez was in current (unlawful) possession of firearms or ammunition. But could they reasonably believe firearms or ammunition would be found in Hernandez's vehicles?

Lieutenant Plueger's affidavit does not contain any evidence tying Hernandez's vehicles to his possession of firearms—it does not mention his vehicles at all. And the landlord's (unincluded) statement that Hernandez told him he kept a handgun for home defense cuts against an inference that Hernandez stored the weapon in his vehicle. The Government elicited no testimony from Lieutenant Plueger at the hearing on his experience with people who possessed firearms, such as that they commonly store

---

[21] I need not address the Government's alternative argument that the evidence in the residence would inevitably have been discovered during an eviction, but the facts elicited by Lieutenant Plueger's testimony at the hearing on the sheriff's office process for evictions casts doubt on that argument.

ammunition in vehicles, or that those who keep firearms for home defense also tend to keep firearms in their vehicles for protection.

The Eighth Circuit has recognized that one may infer people keep firearms "at home or on their persons."[22]  It has not extended this inference to vehicles (although it has not had the opportunity to do so).  Some district courts have recognized "[i]t is reasonable to conclude that [a person] would store . . . guns either in his home or vehicles," although these cases can be distinguished on their facts.[23]  In addition, when

---

[22] *Cowling*, 648 F.3d at 695 (quoting *Steeves,* 525 F.2d at 38).

[23] *United States v. Brown*, No. CR 12-30115, 2013 WL 943619, at *1-2, *6 (D.S.D. Mar. 11, 2013) (upholding warrant finding probable cause existed to search defendant's residence and vehicles for evidence of domestic violence and drug use, in addition to firearm possession, based on evidence that defendant was frequent methamphetamine user, defendant assaulted his live-in girlfriend outside their home, and defendant's mother stated he shot his daughter's dog and had two firearms in his possession, despite being a felon; in addition, the court's discussion of nexus to vehicles is relatively brief and runs together with its analysis of the much stronger nexus in a second challenged warrant); *see also United States v. Dunford*, No. 2:19-CR-00038, 2019 WL 5431614, at *1-2, *7 (E.D. Tenn. Oct. 23, 2019) (holding that when defendant, a felon, posted undated pictures of himself on social media at the shooting range and threatened to "shoot back" at police officers, probable cause existed to search his vehicle for firearms based on "the common-sense inference that he used his vehicle to transport the firearms and ammunition from his residence to the range, and even to store these items" (citing *United States v. Morris*, No. CR 117-039, 2017 WL 5180970, at *1, *4 (S.D. Ga. Oct. 19, 2017) ("Common sense dictates that hunters keep hunting devices and quarry in their vehicles and homes, and felons in possession of firearms often store them in the same locations.") (surveillance video showed defendant, a felon, driving to a pond and retrieving a rifle from his truck to hunt for alligators), *report and recommendation adopted without objection,* 2017 WL 5180436 (Nov. 8, 2017); and *United States v. Tisdale*, 70 F. Supp. 2d 1210, 1213-16 (D. Kan. 1999) (defendant, a felon, saw the trunk of his car open, thought he was being burglarized, and exchanged shots with the would-be burglar, and officers later found the firearm used in the shooting and drugs hidden under a couch cushion in defendant's residence; the court found probable cause "that evidence pertaining to the attempted burglary . . . , the shooting, the possession of drugs, and the unlawful possession of a gun would be found" in his car based on inference that if defendant had guns and drugs with him just prior to the shooting, "they had been kept either in his house or in his car" and "other evidence related to those items would be found in the same place"; law enforcement did not seek to search defendant's two vehicles covered with a tarp and parked behind defendant's residence with no connection to the burglary or shooting)).  In addition, one district court in this circuit has held it reasonable to infer firearms would be found in defendant's vehicle *after* officers

there is a nexus to defendant's firearm possession and *a* vehicle, the Eighth Circuit has upheld (under good faith, in an unpublished decision) a warrant authorizing the search of additional vehicles linked to the defendant.[24]

---

searched defendant's residence and did not find any firearms. *See United States v. Malone*, No. 21-cr-217, 2022 WL 1486396, at *3 (D. Minn. May 11, 2022).

[24] *See United States v. Dankemeyer*, No. 4:21CR3014, 2021 WL 7287669, at *1, *4 (D. Neb. Dec. 13, 2021) (when law enforcement had probable cause to believe defendant had threatened individuals with a firearm that night and then drove off in a vehicle, as well as witness statements generally stating defendant possessed multiple firearms, upholding warrant authorizing search of defendant's residence and any vehicles located at the residence and owned by an occupant of the residence; even though the vehicle ultimately searched did not match the description of the vehicle defendant had used that night, the court held it reasonable to believe evidence of defendant's gun possession might be located in the vehicle), *report and recommendation adopted*, 2022 WL 676714 (Mar. 7, 2022) (not objecting to nexus conclusion), *aff'd,* No. 22-2850, 2023 WL 5423521, at *1-2 (8th Cir. Aug. 23, 2023) (per curiam) (when defendant argued "the affidavit failed to show a nexus between the guns and the search of his home and car" and was "'so facially deficient' because it authorized a search of all cars on his property," holding good-faith exception applied because "there was enough information in the affidavit such that the officers' reliance was not 'entirely unreasonable,'" and search of cars "was limited to cars 'belonging to the occupants'"); *see also United States v. Jones*, 388 F. App'x 175, 176-78 (3d Cir. 2010) (upholding warrant to search two vehicles registered to felon defendant, including a Ford truck, based on officer's view of ammunition in plain view at defendant's residence, and information from defendant's girlfriend that she had seen a firearm in defendant's possession and told him to get rid of it and that defendant "had once told her there were firearms in his Ford truck"; the court noted that even if the girlfriend's statements were too speculative to support probable cause, the good-faith exception applied); *United States v. Payton*, No. 23-cr-192 (1), 2024 WL 1528387, at *4-5 (D. Minn. Feb. 1, 2024) (holding it was not "entirely unreasonable," when defendant traveled in his vehicle with a firearm and then used that firearm to commit carjacking and abandoned both his vehicle and the firearm at the scene, for officer "to follow the court's command" and search the abandoned vehicle for firearms pursuant to a warrant; thus, the good-faith exception applied, even though it appeared to be "a crime of opportunity" after defendant's vehicle got stuck in the snow, and "nothing . . . suggest[ed] that [defendant] might have *another* firearm or ammunition in his [vehicle]"), *report and recommendation adopted*, 2024 WL 1343121, at *6 (Mar. 29, 2024) (sharing concerns about probable cause to search vehicle, but finding good-faith nexus to search vehicle based on probable cause of defendant's criminal conduct and "identif[ying] that *his* vehicle was the one to be searched").

Here, a reasonable officer could infer that Hernandez used a vehicle to transport the AR-15 to the gun store for the sale.  On the other hand, this would only place a firearm in one of his vehicles for a short period of time that necessarily ended months before the execution of the warrant.

Ultimately, I find that the warrant materials and lack of nexus are not so bare bones that no reasonable officer could believe probable cause existed to search the vehicles.  In cases in which courts have held the good-faith exception does not apply based on a lack of nexus, there has not been a nexus connecting the defendant to the place to be searched,[25] or connecting the defendant to criminal activity.[26]  Here, the warrant indicated that the vehicles to be searched were registered to Hernandez (who officers could reasonably believe unlawfully possessed firearms and ammunition).  This satisfies the minimal nexus needed for good faith.[27]  In addition, both the issuing judge and the

---

[25] *See United States v. Wilson*, 153 F.4th 478, 485-86 (5th Cir. 2025) (holding that good faith did not apply when officers had probable cause defendant brandished a weapon unlawfully but record was "dubious, at best" that defendant lived at the apartment to be searched; court also made broad statements against inferring firearms will be found in their owner's residences, but this language appears contrary to binding Eighth Circuit precedent); *United States v. Gonzales*, 399 F.3d 1225, 1231 (10th Cir. 2005) (holding that good faith did not apply when warrant set forth probable cause that defendant unlawfully possessed a firearm but did not "establish[] the residence [to be searched] belonged to or was otherwise linked to" defendant); *United States v. Johnson*, 806 F. Supp. 3d 886, 889, 893 (D. Minn. 2025) (holding that good-faith exception did not apply to search of woman's residence when affidavit set forth probable cause that defendant was involved in shootings and linked defendant to the woman's residence based only on the defendant riding in the woman's car once, communicating with the woman on social media, and accessing his social media once from the woman's residence in the early morning hours).

[26] *See United States v. Ralston*, 88 F.4th 776, 781 (8th Cir. 2023) (holding that good-faith exception did not apply to affidavit setting forth probable cause that defendant's neighbor was involved in burglaries but "said little about [defendant] and lacked any specifics connecting [defendant] or his residence to the offenses under investigation" beyond "the proximity of residences on rural property").

[27] *See United States v. Fletcher*, No. 16-20336, 2016 WL 6277160, at *3-4 (E.D. Mich. Oct. 27, 2016) (when law enforcement discovered a stolen firearm, non-matching ammunition, and

14

county attorney with whom Lieutenant Plueger consulted believed there was probable cause to search the vehicles. I acknowledge that the county attorney meeting cuts both ways—Lieutenant Plueger's police report could be read to suggest he included the vehicles as an afterthought and because the county attorney told him to;[28] at the hearing, he could not remember who originally thought to include the vehicles in the search warrant application. Still, that a lawyer thought probable cause existed weighs more in favor of reasonable reliance than against it.

Overall, I find that the exclusionary rule does not bar admission of evidence obtained from the vehicles based on the officers' reasonable reliance on the warrant to search those vehicles.

### III.    OCTOBER 2025 PAT DOWN

Hernandez argues that officers lacked reasonable suspicion to frisk him for weapons during the pedestrian stop for walking on the wrong side of the street. During a stop, "the Fourth Amendment . . . allows officers to conduct a protective frisk of the individual for weapons, but only if they have 'reasonable suspicion that the person with whom they are dealing might be armed and presently dangerous.'"[29]

---

evidence defendant was committing identity theft in his residence, holding that no nexus existed to connect evidence of these crimes with the search of his vehicles; but holding that the good-faith exception applied because the warrant set forth the "minimally sufficient nexus" needed for good faith by "explain[ing] the connection between the Defendant and the vehicles, connect[ing] the cars to the house in terms of proximity, and list[ing] the contraband found in the house").

[28] Lieutenant Plueger's police report indicates that "[i]n speaking with the County Attorney's Office, it was their opinion that we should conduct a search on both Rocky Hernandez'[s] residence and his vehicles." Ex. C. When listing the property to be searched in the warrant application, the residence is listed, followed by "Also," the vehicles. Ex. A.

[29] *United States v. Jimenez*, 75 F.4th 848, 852 (8th Cir. 2023) (cleaned up) (quoting *United States v. Slater*, 979 F.3d 626, 629 (8th Cir. 2020)).

> Reasonable suspicion is determined by "looking at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing based upon his own experience and specialized training to make inferences from and deductions about the cumulative information available."[30]

The court considers "'what the officer reasonably knew at the time' rather than assessing the existence of reasonable suspicion 'with the vision of hindsight.'"[31]

According to her report, Officer Malone believed she had reasonable suspicion to search for weapons based on the following factors: (1) "he had a bladed stance and was being argumentative over basic questions," (2) he placed his hands in his pockets when she asked why he did not want to be searched; and (3) he was walking late at night in a high-crime area. Ex. D. Officer Malone testified that Hernandez stood with a bladed stance as soon as she stopped him, with one foot back from the other in a manner that suggested he had some kind of contraband on his person. "A bladed stance [has been defined as] when the individual puts one foot forward and angles toward someone in an aggressive or fighting stance."[32] Officer Malone's body camera video shows that Hernandez appeared to be standing normally with his feet shoulder width apart; he is standing at an angle from Officer Malone so that from her point of view, one foot is in front of the other; but his body is angled in the same direction. Hernandez's stance does not suggest aggression or fighting. In addition, at the time Officer Malone said she would be conducting a pat-down search, the body camera video shows that Hernandez's tone was congenial; if anyone was argumentative, it was Officer Malone. After Officer Malone announced her intention to conduct a pat-down, Hernandez was a bit more

---

[30] *Id.* (cleaned up) (quoting *United States v. Jones*, 606 F.3d 964, 965-66 (8th Cir. 2010)).

[31] *Id.* (quoting *Slater*, 979 F.3d at 629).

[32] *Gipp v. Webb*, No. 19-cv-00213, 2024 WL 278214, at *2 n.4 (D.N.D. Jan. 25, 2024), *aff'd,* No. 24-1379, 2025 WL 2630489 (8th Cir. Sept. 12, 2025).

argumentative. As for Officer Malone's claim that Hernandez's hands were in his pockets, his hands had been out of his pockets since he first began talking to Officer Malone (he had been walking with his hands in the pockets of his hoodie before he was stopped). *See* Ex. 1 at 0:00-1:58. During the suppression hearing, when the prosecuting attorney went through the body camera video for Officer Malone to point out what she thought was suspicious, she noted Hernandez's hands in his pockets, but this was *after* she asked him to retrieve his identification from his pocket. Regarding the high-crime area, Officer Malone testified that there were two known drug houses in the area and that not many businesses (other than gas stations and one bar on the other side of town) were open at that time of night.

In addition, the Government notes that when Officer Malone asked Hernandez where he was headed, he pointed in the direction he had just come from. Officer Malone also stated she found it suspicious that Hernandez kept bringing up the dog that had tried to bite him, which she perceived as an effort to change the subject from the search—but the biting dog served as an explanation for why Hernandez was walking on the wrong side of the street (to avoid the dog). Officer Malone additionally testified that Hernandez's eyes were shifty, and he appeared nervous, but I question this testimony based on other inconsistencies I have already noted.

Finally, other factors cut against finding reasonable suspicion to frisk Hernandez. Officer Malone repeatedly testified that she suspected Hernandez had "contraband" on his person, as opposed to weapons. She also suggested that she did not feel unsafe once her partner arrived on the scene. She told Hernandez on the scene multiple times that if he simply allowed the search, she would not issue him a citation for the walking offense and would allow him to go on his way. She testified that she found Hernandez's refusal to consent to a search to be suspicious.

I do not find reasonable suspicion supported the frisk for weapons. It seems from the body camera evidence and Officer Malone's testimony that she believed Hernandez

might have drugs on his person, which she hoped to uncover through a consensual search. When Hernandez refused, she decided to conduct a pat-down search. Her focus was not on officer safety or whether Hernandez possessed weapons, as required to support such a frisk, and it largely appears that her "suspicion" was founded on Hernandez's refusal to provide consent. I do not find reasonable suspicion exists under these circumstances.

I recommend suppressing the evidence obtained from Hernandez's person from Officer Malone's search of his person.

### IV.    CONCLUSION

I recommend **GRANTING IN PART AND DENYING IN PART** Hernandez's motion to suppress (Doc. 24). I recommend denying suppression of evidence seized pursuant to the November 2024 search warrant, and suppressing the firearm and drug evidence seized from Hernandez's person during the stop-and-frisk in Texas in October 2025.

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections.[33] Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[34] Failure to object to the Report and Recommendation waives the right to de

---

[33] **LCrR 59**.

[34] *See* **Fed. R. Crim. P. 59**.

novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[35]

**DATED** June 26, 2026.

Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

---

[35] *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).